# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SHELLEY R. GARNICK, TANAJAH )
CLARK and ZOE R. JONES, individually )
and on behalf of all others similarly situated, )    **CIVIL ACTION NO.:**
                                       )
                   Plaintiffs, )
                                       )
          v. )    **CLASS ACTION COMPLAINT**
                                       )
WAKE FOREST UNIVERSITY BAPTIST )
MEDICAL CENTER, THE BOARD OF )
DIRECTORS OF WAKE FOREST )
UNIVERSITY BAPTIST MEDICAL )
CENTER, THE RETIREMENT BENEFIT )
COMMITTEE OF WAKE FOREST )
UNIVERSITY BAPTIST MEDICAL )
CENTER and JOHN DOES 1-30. )
                                       )
                Defendants. )

## COMPLAINT

Plaintiffs, Shelley R. Garnick, Tanajah Clark and Zoe R. Jones ("Plaintiffs"), by and through their attorneys, on behalf of the Wake Forest Baptist Medical Center 403(b) Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.      INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Wake Forest University Baptist Medical Center ("Wake Forest" or "Company") and the Board of Directors of Wake Forest University Baptist Medical Center and

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

its members during the Class Period[2] ("Board") and the Retirement Benefit Committee of Wake Forest University Baptist Medical Center and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).  These twin fiduciary duties are "the highest known to the law." *Tatum v. RJR Pension Investment Committee et al.*, 761 F.3d 346, 356 (4th Cir. 2014).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See*, "*A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

---

[2] The Class Period, as will be discussed in more detail below, is defined as June 4, 2015 through the date of judgment.

Case 1:21-cv-00454-WO-JLW   Document 1   Filed 06/04/21   Page 2 of 34

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

6. Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7. Although the Plan is a 403(b) Plan, it serves the same purpose as a 401(k) plan: as a vehicle for retirement savings. Most participants in defined contribution plans like 401(k) or 403(b) plans expect that their accounts will be their principal source of income after retirement. Although at all times accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8. Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 403(b) or 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

9. At all times during the Class Period (June 4, 2015 through the date of judgment), the Plan had at least 1.2 billion dollars in assets under management. At the end of 2018 and 2019,

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 16, 2021) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

the Plan had over 1.8 billion dollars and 2.3 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

10.     The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's administrative and recordkeeping costs.

12.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III. PARTIES

### Plaintiffs

17. Plaintiff, Shelley R. Garnick ("Garnick"), resides in Winston-Salem, North Carolina. During her employment, Plaintiff Garnick participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

18. Plaintiff, Tanajah Clark ("Clark"), resides in Winston-Salem, North Carolina. During her employment, Plaintiff Clark participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

19. Plaintiff, Zoe R. Jones ("Jones"), resides in Wendell, North Carolina. During her employment, Plaintiff Jones participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

21.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available identical funds, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

22.     Wake Forest is the Plan sponsor and a named fiduciary with a principal place of business being Medical Center Boulevard, Winston-Salem, North Carolina.  The December 31,2019 Form 5500 of the Wake Forest Baptist Medical Center 403(b) Retirement Savings Plan filed with the United States Department of Labor ("2019 Form 5500") at 1.

23.     Wake Forest describes itself as: "a pre-eminent academic health system based in Winston-Salem, North Carolina."[4] Wake Forest employs "more than 2,500 physicians" at "more than 350 primary and specialty care locations." *Id.*

---

[4] https://www.wakehealth.edu/About-Us last accessed on April 22, 2021.

24. Wake Forest appointed the Committee to, among other things, assume "the responsibility for selecting and monitoring the investment options under the Plans which are defined contribution plans." The Charter of the Retirement Benefit Committee of Wake Forest Baptist Medical Center ("Charter") at 1. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25. Accordingly, the Company had a concomitant fiduciary duty to monitor and supervise those appointees.

26. Accordingly, Wake Forest during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

**Board Defendants**

27. Wake Forest, acting through its Board of Directors, appointed the Committee to, among other things, be responsible "for selecting and monitoring the investment options under the Plans which are defined contribution plans." Charter at 1. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28. Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

29. The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

7

**Committee Defendants**

30.     As discussed above, the Committee is responsible "for selecting and monitoring the investment options under the Plans which are defined contribution plans." Charter at 1. As will be discussed in more detail below, the Committee failed to properly carry out these fiduciary responsibilities. The Charter provides more detail on the Committee's purported responsibilities. Section IX of the Charter provides: "the Committee shall have the powers and duties to … [p]eriodically review the investment options made available under each DC Plan, including, but not limited to, for investment performance, reasonableness of fees … ." Charter at 5. Based on this review, the Committee must: "[d]etermine and periodically modify at its discretion the menu of investment options made available to participants … ." *Id.* However, as will be discussed in more detail below, the Committee fell well short of these fiduciary standards.

31.     Further, the Committee is required to: "[s]elect and monitor a recordkeeper for the Plans" and to "[e]stablish performance standards for the recordkeeper … ." Charter at 6. Should the recordkeeper fail to perform appropriately, the Committee must take "appropriate action when such investment manager or service provider fails to perform against established guidelines and standards." *Id.* As will be discussed below, given the grossly expensive administration and recordkeeping costs during the Class Period, it is clear the Committee failed to carry out these fiduciary duties prudently.

32.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

33.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

34.     To the extent that there are additional officers, employees and/or contractors of Wake Forest who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Wake Forest officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.     CLASS ACTION ALLEGATIONS

35.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between June 4, 2015 through the date of judgment (the "Class Period").

36.     The members of the Class are so numerous that joinder of all members is impractical.  The 2019 Form 5500 lists 30,010 Plan "participants with account balances as of the end of the plan year."  2019 Form 5500 at 2.

37.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Case 1:21-cv-00454-WO-JLW   Document 1   Filed 06/04/21   Page 9 of 34

herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

38.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

      A.      Whether Defendants are/were fiduciaries of the Plan;

      B.      Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

      C.      Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

      D.      The proper form of equitable and injunctive relief; and

      E.      The proper measure of monetary relief.

39.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

40.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of

other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

41.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

42.     The purpose of the Plan is to offer "the opportunity to save for a more comfortable retirement … ." The  Summary Plan Description of the Wake Forest Baptist Medical Center 403(b) Retirement Savings Plan effective as of January 1, 2012 ("SPD") at ii.

43.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. The Wake Forest Baptist Medical Center 403(b) Retirement Savings Plan as Amended and Restated on January 1, 2012 ("Plan Doc.") at 70. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

### *Eligibility*

44.     In general, regular full-time employees are eligible to participate in the Plan. The December 31, 2019 Report of the Independent Auditor of the Wake Forest Baptist Medical Center 403(b) Retirement Savings Plan ("2019 Auditor Report"). As stated in the Auditor Report: "all permissible employees of the Plan Sponsor … are eligible to enroll on their date of hire and may begin to make deferrals to the Plan immediately." 2019 Auditor Report at 6.

Case 1:21-cv-00454-WO-JLW   Document 1   Filed 06/04/21   Page 11 of 34

*Contributions*

45.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

46.     With regard to employee contributions, "[e]ach year, participants may contribute pretax … annual compensation, as defined in the Plan document, subject to Internal Revenue Code ("IRC") limitations." *Id*. Wake Forest may elect to make matching contributions to the Plan on behalf of their employees. As detailed in the 2019 Auditor Report: "[t]he Plan provides for 'safe harbor' dollar for dollar matching contributions up to 4% of each employee's compensation" *Id.*

47.     Like other companies that sponsor 403(b) or 401(k) plans for their employees, Wake Forest enjoys both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 403(b) or 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

48.     Wake Forest and its clients also benefit in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

49.     Given the size of the Plan, Wake Forest likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

50.     Participants are immediately vested in their own contributions made to the Plan. 2019 Auditor Report at 7. Participants are subject to a 3 year vesting schedule before any employer matching contributions are considered earned. *Id.* As stated in the Auditor Report: "[p]articipants become 100% vested after three years of service. If less than three years of service is completed then none of this amount is vested." *Id.*

*The Plan's Investments*

51.     In theory, the Committee responsibilities include selection and monitoring of the funds available for investment in the Plan.  Charter at 1.  As further stated in the Committee's Charter: "[t]he Committee shall perform its duties under the Plans solely in the interests of the participants and their beneficiaries." *Id.*  But in practice, as alleged below, that is not what happened.

52.     Several funds were available to Plan participants for investment each year during the putative Class Period. Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee. 2019 Auditor Report at 7.

53.     The Plan's assets under management for all funds as of December 31, 2019 was $2,315,132,904.  2019 Auditor Report at 4.

*Payment of Plan Expenses*

54.     During the Class Period, administrative expenses were paid for using Plan assets. The Plan Document provides that expenses may be paid from Trust but the Trust "shall be used for the exclusive benefit of Participants and their beneficiaries, and to pay administrative expenses of the Plan to the extent not paid by the Corporation if permitted under the applicable Funding Agreement." Plan Doc. at 77.  The 2019 Form 5500 shows that administrative expenses were, in fact, paid by the Plan. 2019 Form 5500 at 2.

13

## VI.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

55.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

56.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

57.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

### A.   The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

### (1)   Many of the Plan's Mutual Funds Had Investment Management Fees In Excess of Fees for Funds in Similarly-Sized Plans

58.     Another indication of Defendants' failure to prudently monitor the Plan's funds is that many of the mutual funds, which, as of 2019, held more than ***957 million dollars*** in assets were more expensive than comparable funds found in similarly sized plans (plans having more than 1 billion dollars in assets).

59.     In 2019, these funds were more expensive than comparable mutual funds found in similarly sized plans. The expense ratios for these funds were up to ***280%*** (in the case of

BlackRock Inflation Protected Bond Inv A) and up to *273%* (in the case of Loomis Sayles Strategic

Income A) above the median expense ratios in the same category: [6]

| ICI Median Chart | | | |
|---|---|---|---|
| **2019 Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Median** |
| American Beacon International Eq Inv | 1.07 % | International Equity | 0.44% |
| American Funds 2010 Trgt Date Retire R5 | 0.35 % | Target-date | 0.13% |
| American Funds 2015 Trgt Date Retire R5 | 0.35 % | Target-date | 0.13% |
| American Funds 2020 Trgt Date Retire R5 | 0.36 % | Target-date | 0.13% |
| American Funds 2025 Trgt Date Retire R5 | 0.38 % | Target-date | 0.13% |
| American Funds 2030 Trgt Date Retire R5 | 0.40 % | Target-date | 0.13% |
| American Funds 2035 Trgt Date Retire R5 | 0.42 % | Target-date | 0.13% |
| American Funds 2040 Trgt Date Retire R5 | 0.43 % | Target-date | 0.13% |
| American Funds 2045 Trgt Date Retire R5 | 0.44 % | Target-date | 0.13% |
| American Funds 2050 Trgt Date Retire R5 | 0.44 % | Target-date | 0.13% |
| American Funds 2055 Trgt Date Retire R5 | 0.44 % | Target-date | 0.13% |
| American Funds 2060 Trgt Date Retire R5 | 0.45 % | Target-date | 0.13% |
| BlackRock Inflation Protected Bond Inv A | 0.90 % | Domestic Bond | 0.26% |
| ClearBridge Appreciation I | 0.66 % | Domestic Equity | 0.41% |
| Cohen & Steers Realty Shares | 0.89 % | Domestic Equity | 0.41% |
| Fidelity New Markets Income | 0.81 % | International Equity | 0.44% |
| Goldman Sachs Small Cap Value Instl | 0.96 % | Domestic Equity | 0.41% |
| Janus Henderson Enterprise T | 0.91 % | Domestic Equity | 0.41% |
| Loomis Sayles Strategic Income A | 0.97 % | Domestic Bond | 0.26% |
| MFS International New Discovery I | 1.04 % | International Equity | 0.44% |
| MFS Value I | 0.58 % | Domestic Equity | 0.41% |
| Neuberger Berman Sustainable Eq Instl | 0.68 % | Domestic Equity | 0.41% |

---

[6] *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 403(b) Plans, 2017* at 49 (January 2021) (hereafter, "ICI Study") available at https://www.ici.org/system/files/attachments/pdf/21_ppr_dcplan_profile_403b.pdf

| ICI Median Chart | | | |
|---|---|---|---|
| **2019 Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Median** |
| T. Rowe Price Small-Cap Stock Adv | 1.16 % | Domestic Equity | 0.41% |
| Templeton Global Bond Adv | 0.67 % | International Bond | 0.65% |
| TIAA Real Estate Account | 0.83 % | Domestic Equity | 0.41% |
| TIAA-CREF Lifecycle 2010 Institutional | 0.37 % | Target-date | 0.13% |
| TIAA-CREF Lifecycle 2015 Institutional | 0.38 % | Target-date | 0.13% |
| TIAA-CREF Lifecycle 2020 Institutional | 0.39 % | Target-date | 0.13% |
| TIAA-CREF Lifecycle 2025 Institutional | 0.41 % | Target-date | 0.13% |
| TIAA-CREF Lifecycle 2030 Institutional | 0.42 % | Target-date | 0.13% |
| TIAA-CREF Lifecycle 2035 Institutional | 0.43 % | Target-date | 0.13% |
| TIAA-CREF Lifecycle 2040 Institutional | 0.44 % | Target-date | 0.13% |
| TIAA-CREF Lifecycle 2045 Institutional | 0.45 % | Target-date | 0.13% |
| TIAA-CREF Lifecycle 2050 Institutional | 0.45 % | Target-date | 0.13% |
| TIAA-CREF Lifecycle 2055 Institutional | 0.45 % | Target-date | 0.13% |
| TIAA-CREF Lifecycle 2060 Institutional | 0.45 % | Target-date | 0.13% |
| TIAA-CREF Lifestyle Income Institutional | 0.43 % | Target-date | 0.13% |
| TIAA-CREF Real Estate Sec Instl | 0.50 % | Domestic Equity | 0.41% |
| Vanguard Total Intl Stock Index Admiral | 0.11% | Index Fund | 0.05% |
| Virtus Vontobel Emerging Markets Opps I | 1.26 % | International Equity | 0.44% |

60.     The high cost of the Plan's funds is similarly egregious when comparing the Plan's funds to the average fees of funds in similarly-sized plans:

| ICI Average Chart | | | |
|---|---|---|---|
| **2019 Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Average** |
| American Beacon International Eq Inv | 1.07 % | International Equity | 0.45% |
| American Funds 2010 Trgt Date Retire R5 | 0.35 % | Target-date | 0.21% |
| American Funds 2015 Trgt Date Retire R5 | 0.35 % | Target-date | 0.21% |

16

| ICI Average Chart | | | |
|---|---|---|---|
| **2019 Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Average** |
| American Funds 2020 Trgt Date Retire R5 | 0.36 % | Target-date | 0.21% |
| American Funds 2025 Trgt Date Retire R5 | 0.38 % | Target-date | 0.21% |
| American Funds 2030 Trgt Date Retire R5 | 0.40 % | Target-date | 0.21% |
| American Funds 2035 Trgt Date Retire R5 | 0.42 % | Target-date | 0.21% |
| American Funds 2040 Trgt Date Retire R5 | 0.43 % | Target-date | 0.21% |
| American Funds 2045 Trgt Date Retire R5 | 0.44 % | Target-date | 0.21% |
| American Funds 2050 Trgt Date Retire R5 | 0.44 % | Target-date | 0.21% |
| American Funds 2055 Trgt Date Retire R5 | 0.44 % | Target-date | 0.21% |
| American Funds 2060 Trgt Date Retire R5 | 0.45 % | Target-date | 0.21% |
| BlackRock Inflation Protected Bond Inv A | 0.90 % | Domestic Bond | 0.27% |
| ClearBridge Appreciation I | 0.66 % | Domestic Equity | 0.37% |
| Cohen & Steers Realty Shares | 0.89 % | Domestic Equity | 0.37% |
| Fidelity New Markets Income | 0.81 % | International Equity | 0.45% |
| Goldman Sachs Small Cap Value Instl | 0.96 % | Domestic Equity | 0.37% |
| Janus Henderson Enterprise T | 0.91 % | Domestic Equity | 0.37% |
| Loomis Sayles Strategic Income A | 0.97 % | Domestic Bond | 0.27% |
| MFS International New Discovery I | 1.04 % | International Equity | 0.45% |
| MFS Value I | 0.58 % | Domestic Equity | 0.37% |
| Neuberger Berman Sustainable Eq Instl | 0.68 % | Domestic Equity | 0.37% |
| T. Rowe Price Small-Cap Stock Adv | 1.16 % | Domestic Equity | 0.37% |
| Templeton Global Bond Adv | 0.67 % | International Bond | 0.60% |
| TIAA Real Estate Account | 0.83 % | Domestic Equity | 0.37% |
| TIAA-CREF Lifecycle 2010 Institutional | 0.37 % | Target-date | 0.21% |
| TIAA-CREF Lifecycle 2015 Institutional | 0.38 % | Target-date | 0.21% |
| TIAA-CREF Lifecycle 2020 Institutional | 0.39 % | Target-date | 0.21% |
| TIAA-CREF Lifecycle 2025 Institutional | 0.41 % | Target-date | 0.21% |

Case 1:21-cv-00454-WO-JLW   Document 1   Filed 06/04/21   Page 17 of 34

| ICI Average Chart | | | |
|---|---|---|---|
| **2019 Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Average** |
| TIAA-CREF Lifecycle 2030 Institutional | 0.42 % | Target-date | 0.21% |
| TIAA-CREF Lifecycle 2035 Institutional | 0.43 % | Target-date | 0.21% |
| TIAA-CREF Lifecycle 2040 Institutional | 0.44 % | Target-date | 0.21% |
| TIAA-CREF Lifecycle 2045 Institutional | 0.45 % | Target-date | 0.21% |
| TIAA-CREF Lifecycle 2050 Institutional | 0.45 % | Target-date | 0.21% |
| TIAA-CREF Lifecycle 2055 Institutional | 0.45 % | Target-date | 0.21% |
| TIAA-CREF Lifecycle 2060 Institutional | 0.45 % | Target-date | 0.21% |
| TIAA-CREF Lifestyle Income Institutional | 0.43 % | Target-date | 0.21% |
| TIAA-CREF Real Estate Sec Instl | 0.50 % | Domestic Equity | 0.37% |
| Vanguard Total Intl Stock Index Admiral | 0.11% | Index Fund | 0.08% |
| Virtus Vontobel Emerging Markets Opps I | 1.26 % | International Equity | 0.45% |

61.     Although a good gauge of Defendants' imprudence, median-based and average-based comparisons still understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available (which Defendants failed to consider) that offered lower expenses than the median and average fees.

62.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median fee is based on a study conducted in 2017 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for domestic equity funds for plans with 1 billion dollars in assets was .48% using 2015 data compared with .41% in 2017.  Accordingly, the median expense ratios in 2020 utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2020 expense ratios utilized in the above chart for the Plan's current funds and the median expense ratios in the same category.

**(2)** **Many of the Plan's Primary Mutual Funds Were Not in the Lowest Fee Share Class Available to the Plan During the Class Period**

63.     Another fiduciary breach stemming from Defendants' flawed investment monitoring system resulted in the failure to identify available lower-cost share classes of many of the funds in the Plan during the Class Period.

64.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.  Because the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  *Tibble*, 2017 WL 3523737, at * 13.

65.     Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets. Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan.  *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24).

66.     Here, 26 of the mutual funds in the Plan in 2019 were not in the lowest share class. In 2019, the total assets under management for these funds was more than ***939 million dollars*** thus easily qualifying them for lower share classes.  The following chart provides details on these funds and their assets under management as of the end of 2019:

| 2019 Fund | 2019 Assets Under Management |
| --- | --- |
| American Funds 2050 Trgt Date Retire R5 | $79,153,907 |
| American Funds 2040 Trgt Date Retire R5 | $46,117,051 |
| American Funds 2035 Trgt Date Retire R5 | $44,400,211 |

19

| 2019 Fund | 2019 Assets Under Management |
|---|---|
| American Funds 2030 Trgt Date Retire R5 | $37,536,397 |
| American Funds 2025 Trgt Date Retire R5 | $32,427,416 |
| American Funds 2045 Trgt Date Retire R5 | $28,024,047 |
| American Funds 2055 Trgt Date Retire R5 | $22,505,094 |
| American Funds 2020 Trgt Date Retire R5 | $19,282,757 |
| American Funds 2060 Trgt Date Retire R5 | $8,179,993 |
| American Funds 2010 Trgt Date Retire R5 | $6,044,511 |
| American Funds 2015 Trgt Date Retire R5 | $4,031,768 |
| MFS Value I | $100,702,291 |
| Janus Henderson Enterprise T | $58,309,647 |
| Wells Fargo Core Bond Inst | $38,972,981 |
| ClearBridge Appreciation I | $37,618,534 |
| Vanguard Mid Cap Index Admiral | $36,556,618 |
| Vanguard Total Intl Stock Index Admiral | $33,167,618 |
| BlackRock Inflation Protected Bond A | $31,755,566 |
| Loomis Sayles Strategic Inc A | $33,368,486 |
| CREF Stock R2 | $117,086,970 |
| CREF Bond R2 | $10,668,369 |
| Vanguard Small Cap Index Adm | $31,332,832 |
| American Beacon International Eq Inv | $30,031,616 |
| Neuberger Berman Sustainable Equity Inst | $23,473,959 |
| T. Rowe Price Small-cap Stock Adv | $17,249,714 |

| **2019 Fund** | **2019 Assets Under Management** |
|---|---|
| Virtus Vontobel Emerging Markets Opps I | $11,776,927 |
| **Total:** | $939,775,280 |

67.    In several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.

68.    The below chart uses 2021 expense ratios to demonstrate cost differentials between the applicable mutual funds and the cheaper identical shares:

| **Current Fund** | **2021 Exp Ratio** | **Active Lower Cost Alternative** | **2021 Exp Ratio** | **% Fee Excess** |
|---|---|---|---|---|
| REITX American Funds 2050 Trgt Date Retire R5 | 0.44 % | RFITX American Funds 2050 Trgt Date Retire R6 | 0.39 % | 13% |
| REGTX American Funds 2040 Trgt Date Retire R5 | 0.43 % | RFGTX American Funds 2040 Trgt Date Retire R6 | 0.38 % | 13% |
| REFTX American Funds 2035 Trgt Date Retire R5 | 0.42 % | RFFTX American Funds 2035 Trgt Date Retire R6 | 0.37 % | 14% |
| REETX American Funds 2030 Trgt Date Retire R5 | 0.40 % | RFETX American Funds 2030 Trgt Date Retire R6 | 0.35 % | 14% |
| REDTX American Funds 2025 Trgt Date Retire R5 | 0.38 % | RFDTX American Funds 2025 Trgt Date Retire R6 | 0.33 % | 15% |
| REHTX American Funds 2045 Trgt Date Retire R5 | 0.44 % | RFHTX American Funds 2045 Trgt Date Retire R6 | 0.39 % | 13% |
| REKTX American Funds 2055 Trgt Date Retire R5 | 0.44 % | RFKTX American Funds 2055 Trgt Date Retire R6 | 0.39 % | 13% |
| RECTX American Funds 2020 Trgt Date Retire R5 | 0.36 % | RRCTX American Funds 2020 Trgt Date Retire R6 | 0.31 % | 16% |

| Current Fund | 2021 Exp Ratio | Active Lower Cost Alternative | 2021 Exp Ratio | % Fee Excess |
|---|---|---|---|---|
| REMTX American Funds 2060 Trgt Date Retire R5 | 0.45 % | RFUTX American Funds 2060 Trgt Date Retire R6 | 0.40 % | 13% |
| REATX American Funds 2010 Trgt Date Retire R5 | 0.35 % | RFTTX American Funds 2010 Trgt Date Retire R6 | 0.30 % | 17% |
| REJTX American Funds 2015 Trgt Date Retire R5 | 0.35 % | RFJTX American Funds 2015 Trgt Date Retire R6 | 0.30 % | 17% |
| MEIIX MFS Value I | 0.58 % | MEIKX MFS Value R6 | 0.47 % | 23% |
| JAENX Janus Henderson Enterprise T | 0.91 % | JDMNX Janus Henderson Enterprise N | 0.66 % | 38% |
| MBFIX Wells Fargo Core Bond Inst | 0.42 % | WTRIX Wells Fargo Core Bond R6 | 0.37 % | 14% |
| SAPYX ClearBridge Appreciation I | 0.66 % | LMESX ClearBridge Appreciation IS | 0.57 % | 16% |
| VIMAX Vanguard Mid Cap Index Admiral | 0.05 % | VMCIX Vanguard Mid Cap Index Institutional | 0.04 % | 25% |
| Vanguard Total Intl Stock Index Admiral | 0.11% | VTSNX Vanguard Total Intl Stock Index I | 0.08 % | 38% |
| BPRAX BlackRock Inflation Protected Bond A | 0.90 % | BPLBX  BlackRock Inflation Protected Bond K | 0.45 % | 100% |
| NEFZX Loomis Sayles Strategic Inc A | 0.97 % | NEZNX Loomis Sayles Strategic Inc N | 0.63% | 54% |
| QCSTPX CREF Stock R2 | 0.39 % | CREF Stock R3 | 0.30% | 30% |
| QCBMPX CREF Bond R2 | 0.32 % | CREF Bond R3 | 0.27% | 19% |
| VSMAX Vanguard Small Cap Index Adm | 0.05 % | VSCIX Vanguard Small Cap Index I | 0.04 % | 25% |

| Current Fund | 2021 Exp Ratio | Active Lower Cost Alternative | 2021 Exp Ratio | % Fee Excess |
|---|---|---|---|---|
| AAIPX American Beacon International Eq Inv | 1.07 % | AAERX American Beacon International Eq R6 | 0.69 % | 55% |
| NBSLX Neuberger Berman Sustainable Equity Inst | 0.68% | NRSRX Neuberger Berman Sustainable Eq R6 | 0.59 % | 15% |
| PASSX T. Rowe Price Small-cap Stock Adv | 1.16 % | OTIIX T. Rowe Price Small-cap Stock I | 0.76% | 53% |
| Virtus Vontobel Emerging Markets Opps I | 1.26% | VREMX Virtus Vontobel Emerging Markets Opps R6 | 0.98 % | 29% |

69.     In addition to the funds enumerated above, from 2015 to 2017 the Plan invested in higher cost share classes of the TIAA Lifecycle target date funds. By 2019, these 11 target date funds, ranging from 2010 to 2060 at five year intervals, housed over 136 million dollars in assets. Although these funds were moved to the institutional share class in 2018, this change was too little too late as the damages to participants in lost savings had already been baked in. These funds should have been changed to the institutional class as soon as possible but by certainly no later than the beginning of the Class Period.

70.     At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

71.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds ***could not have*** (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management

23

flexibility. In short, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

72. In other words, given the size of the Plan, Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received. This reduced the likelihood that Plan participants would achieve their preferred lifestyle in retirement.

### (3) The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period

73. Another result of Defendants' imprudent process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

74. Long-standing DOL guidance explicitly states that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting … service providers" and "monitor … service providers once selected to see that they continue to be appropriate choices." *See,* "*A Look at 401(k) Plan Fees,*" *supra,* at n.3.

75. The Restatement of Trusts also puts cost-conscious management above all else while administering a retirement plan. *Tibble*, 843 F.3d at 1197-98.

76. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

77. A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.

This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George*, 641 F.3d 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2019 Defined Contribution Progress Report ("NEPC Report") at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process).[7] There is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2015 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers.

78.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

79.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers

_____

[7] Available at
https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf.

25

and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

80.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels.

81.    In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees. For example, looking at the combined amount of direct and indirect compensation paid by the Plan as reported on the Plan's 2019 5500 shows that the Plan was paying over $110 per participant in administrative and recordkeeping costs in 2019. In 2015 and 2016, the per participant costs were even higher, being more than $141 per participant and $155 per participant, respectively. The chart below demonstrates these excessive costs:

|  | Participants | Direct | Indirect | Total | $PP |
|---|---|---|---|---|---|
| 2015 | 19,390 | $1,457,441 | $1,280,410 | $2,737,851 | $141 |
| 2016 | 20,598 | $2,184,665 | $1,012,021 | $3,196,686 | $155 |
| 2017 | 22,375 | $1,778,320 | $1,162,789 | $2,941,109 | $131 |
| 2018 | 26,745 | $1,872,674 | $1,267,211 | $3,139,885 | $117 |
| 2019 | 30,010 | $2,176,132 | $1,112,045 | $3,288,177 | $110 |

82.    By way of comparison, we can look at what other plans paid for recordkeeping and administrative costs during the same time period.

83.    The Plan had, conservatively, at least 19,000 participants at all times during the Class Period making it eligible for some of the lowest fees on the market.

26

84.     The NEPC Report cited above took a survey of various defined contribution plan fees. The sample size and respondents included 142 Defined Contribution Plans broken up as follows: 66% Corporate; 21% Healthcare, and 13% Public, Not-for-Profit and other. The average plan had $1.4 billion in assets and 13,377 participants. The median plan had $618 million in assets and 5,770 participants. *See,* NEPC Report at 2.

85.     NEPC's survey found that the majority of plans with over 15,000 participants paid, on average, slightly over $40 per participant in recordkeeping, trust and custody fees. Report at 12. No plan with over 15,000 participants paid more than $61. *Id.*

86.     The Plan had tens of thousands of participants making it eligible for some of the lowest fees on the market. Recently, Fidelity – a recordkeeper for hundreds of plans - stipulated in a lawsuit that a Plan with tens of thousands of participants and over a billion dollars in assets could command recordkeeping fees as low as $14-21. *See Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 204 (D. Mass. Mar. 27, 2020).

87.     Moreover, given the size of the Plan's assets during the Class Period and total number of participants, it had the leverage to bargain for reasonable per participant recordkeeping and administrative costs without utilizing revenue sharing which simply cost Plan participants the opportunity to otherwise use the money that went to pay for revenue sharing.

88.     Additionally, because Plan participants were paying more for recordkeeping than they should have as a result of the Plan fiduciaries' conduct, this confirms that the use of higher-cost share classes cannot be justified as a prudent means to pay recordkeeping and administrative costs via revenue sharing.

89.     Moreover, despite the amount of revenue sharing charged by the Plan, there is no indication that the Plan's fiduciaries returned the revenue sharing collected from the Plan's investments back to the Plan's participants as they should have.

**(3)    The Total Plan Costs were Unreasonable Compared to the Plan's Peers**

90.    "Many types of services are required to operate a [defined contribution] plan, including administrative services (*e.g*., recordkeeping and transaction processing), participant-focused services (*e.g*., participant communication, education, or advice), regulatory and compliance services (*e.g.*, plan document services; consulting, accounting, and audit services; and legal advice), and investment management."[8]

91.    "In order to better understand the impact of fees," BrightScope, a leading plan retirement industry analyst, "developed a total plan cost measure that includes all fees on the audited Form 5500 reports as well as fees paid through investment expense ratios."  ICI Study at 55.

92.    Costs are of course important because "[t]he lower your costs, the greater your share of an investment's return."  Vanguard's Principles for Investing Success, at 17.[9]

93.     One indication that the Plan was poorly run is its dismal ranking among peers when comparing overall efficacy of the Plan.  As of 2019, the Plan is given an ICI/BrightScope ranking of 43 which takes into account "200+ unique data inputs per plan and calculates a single numerical score for every 401k plan in the country."[10] Based on the Plan's rank of 43, ICI/BrightScope determined that the average participant would have to work an additional 25 years and will lose $242,155 in savings as compared to the top rated plan in the peer group.[11] BrightScope makes this calculation based on an average participant at the age of 40 and calculates how long it will take

---

[8] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2017* at 55 (August 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

[9] Available at https://about.vanguard.com/what-sets-vanguard-apart/principles-for-investing-success/

[10] https://www.brightscope.com/401k-rating/2452116/Wake-Forest-University-Baptist-Medical-Center/15530911/Wake-Forest-Baptist-Medical-Center-403B-Retirement-Savings-Plan/

[11] https://www.brightscope.com/faq/401k-retirement/#/DelayCalc

28

that individual to save sufficient retirement income. *Id.* To do this, BrightScope "runs thousands of simulations per plan of the account value growth of the [average participant]." *Id.*

94. According to the ICI Study, the median total plan cost for plans over 1 billion is 0.22% of total assets in a plan. ICI Study at 57. Here, the total plan costs during the Class Period ranged from a high of 0.60% in 2015 to a low of 0.43% in 2018. Total plan costs were .52% in 2019. There's little question the plan was paying at least 100% more in total plan costs than its peers. These excessive costs should have been addressed by the Defendants during the Class Period, but, again, this is something the Defendants failed to do to the great detriment of plan participants.

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

95. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

96. At all relevant times, the Committee Defendants and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

97. As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

29

98.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to control the administrative and recordkeeping expenses of the Plan and to investigate the availability of lower-cost identical products of certain mutual funds and lower cost collective investment trust funds in the Plan.

99.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

100.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

101.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against the Board and Wake Forest)**

102.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

103.     The Board Defendants and Wake Forest (the "Monitoring Defendants") had the authority and obligation to monitor the Committee and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

104.     In light of this authority, the Monitoring Defendants had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

105.     The Monitoring Defendants also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

106.     The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

      (a)     Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

      (b)     failing to monitor the processes by which the Plan's investments were evaluated and the Committee's failure to investigate the availability of identical lower-cost funds; and

31

(c)     failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

107.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

108.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

33

L.      Such other and further relief as the Court deems equitable and just.

Date: June 4, 2021                          Respectfully submitted,
                                            **MATHESON & ASSOCIATES, PLLC**

                                            /s/ John Szymankiewicz          .
                                            John Szymankiewicz
                                            NC Attorney ID # 41623
                                            127 West Hargett Street, Suite 100
                                            Raleigh, NC 27601
                                            (919) 335-5291
                                            Fax (919) 516-0686
                                            Local Civil Rule 83.1 Counsel for Plaintiffs

                                            **CAPOZZI ADLER, P.C.**

                                            /s/ Donald R. Reavey            .
                                            Donald R. Reavey, Esquire
                                            PA Attorney ID #82498
                                            (Admission *Pro Hac Vice* to be Requested)
                                            2933 North Front Street
                                            Harrisburg, PA 17110
                                            donr@capozziadler.com
                                            (717) 233-4101
                                            Fax (717) 233-4103

                                            /s/ Mark K. Gyandoh            .
                                            Mark K. Gyandoh, Esquire
                                            PA Attorney ID # 88587
                                            (Admission *Pro Hac Vice* to be Requested)
                                            **CAPOZZI ADLER, P.C.**
                                            312 Old Lancaster Road
                                            Merion Station, PA 19066
                                            markg@capozziadler.com
                                            (610) 890-0200
                                            Fax (717) 233-4103

                                            Counsel for Plaintiffs and the Putative Class

34